IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| KRISTEN ELIZABETH CRANK, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | CASE NO. 1:26-cv-57 <br><br> DISTRICT JUDGE BRIDGET MEEHAN BRENNAN <br><br> MAGISTRATE JUDGE JAMES E. GRIMES JR. <br><br><br> **REPORT & RECOMMENDATION** |

Plaintiff Kristen Crank filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. For the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In December 2022, Crank filed applications for supplemental security income alleging a disability onset date of November 21, 2022,[1] and claiming

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.,* 193 F. App'x 422, 425 (6th Cir. 2006). Crank initially alleged a disability onset date of September 2010, but at the administrative hearing she amended this date to November 2022. Tr. 17, 48, 360.

she was disabled due to diabetes, left leg tremor, non-alcoholic steatohepatitis, bipolar 2 disorder, anxiety, depression, sleep apnea, fibromyalgia, mitral valve regurgitation and thickening, and heart failure. Tr. 17, 438. The Social Security Administration denied Crank's application and her motion for reconsideration. Tr. 140, 152. Crank then requested a hearing before an Administrative Law Judge (ALJ). Tr. 219.

In January 2024, an ALJ held a hearing, during which Crank and a vocational expert testified. Tr. 73–106. The ALJ then issued a written decision finding that Crank was not disabled. Tr. 167–82. In February 2025, the Appeals Council remanded the case to the ALJ due to issues in the decision regarding the jobs identified by the vocational expert. Tr. 191–92. On remand, the ALJ held another administrative hearing in July 2025. Tr. 41–72. The next month, the ALJ issued a written decision finding that Crank was not disabled. Tr. 17–32. The ALJ's decision became final on November 14, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Crank filed this action on January 9, 2026. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ's residual functional capacity finding is unsupported by substantial evidence. The ALJ failed to consider the impact the frequency of Plaintiff's treatment would have on her ability to work.
>
> 2. The ALJ's residual functional capacity finding is unsupported by substantial evidence. The ALJ failed to build an accurate and logical bridge from the

2

> evidence to the physical and mental findings within the RFC. The ALJ failed to evaluate the medical opinions and prior administrative medical findings pursuant to revised regulations. The ALJ failed to evaluate Plaintiff's symptoms pursuant to SSR 16-3p and 20 C.F.R. § 416.929.

Doc. 8, at 1.

### Evidence

*Personal and vocational evidence*

Crank was 39 years old on the date that she filed her application. Tr. 30. She obtained a GED and used to work as a state-tested nursing assistant. Tr. 439. She last worked in 2010. Tr. 439.

*Relevant medical evidence*[2]

Crank suffers from the following impairments: "diabetes mellitus II with neuropathy; cirrhosis due to fatty liver disease; obesity; mitral valve regurgitation status post mitral valve replacement; obstructive sleep apnea; chronic obstructive pulmonary disease (COPD); bilateral carpel tunnel syndrome, status post left-sided release; hand osteoarthritis; fibromyalgia; vertigo; depressive disorder; anxiety disorder; personality disorder." Tr. 20.

In June 2022, Crank denied experiencing any psychiatric symptoms at a psychological-medication-management visit. Tr. 898. She exhibited normal speech, associations, thought process, and abstraction. Tr. 898–99. Crank had

---

[2]     I discuss in narrative form the medical evidence that the parties present in their briefs. I do not include the list of symptoms and string-cites that Crank presented in her brief, *e.g.,* Doc. 8 at 6–7, although I discuss Crank's argument related to this evidence in the discussion below.

no abnormal thought content, intact insight and judgment, fair memory, poor attention and concentration, intact language and fund of knowledge, and a depressed mood. Tr. 899.

In October 2022, Crank had a medication-management appointment. Tr. 890. She said she was still seeing an outside therapist and had to re-arrange her schedule to accommodate her child's volleyball games. Tr. 890. Crank said that her medications were effective. Tr. 890. On exam, she was overweight and well-groomed, with average demeanor and eye contact. Tr. 890. She had normal speech and thought process, logical associations, and no abnormal or psychotic thoughts. Tr. 890–91. Crank exhibited intact insight, judgment, memory, attention, and concentration, and an average fund of knowledge. Tr. 891–92.

In November 2022, Crank's appearance, affect, insight, and behavior were all within normal limits. Tr. 1001. Crank was distracted and her mood and affect were mildly anxious and "very stressed." Tr. 1001. She said that she was responsible for taking all of her family members to appointments. Tr. 1001.

In December 2022, Crank said that she was having "meltdowns" when she was home by herself and crying episodes that affected her daily expectations. Tr. 880. She said that her carpal tunnel release surgery was "kind of beneficial" but she had "nerve issues" in her left hand and her left hand was sensitive to touch. Tr. 880. Crank reported pain "everywhere," but

4

said that her pain was worse in her hips and hands. Tr. 880. On exam, Crank was well-groomed and overweight with a preoccupied demeanor and avoidant and agitated eye contact. Tr. 880. Her speech was racing and rapid due to her worry about an upcoming liver biopsy. Tr. 879, 880. Crank had racing thoughts and an anxious mood. Tr. 881–82. The provider prescribed the medication Zoloft to address Crank's increased symptoms. Tr. 882–83.

In January 2023, Crank's appearance, insight, and behavior were within normal limits. Tr. 991. Crank's mood was within normal limits, albeit moderately anxious, and her affect was within normal limits, but she was scared about the future. Tr. 991. Crank told the provider that "recent testing" indicated that she needed heart valve replacement surgery. Tr. 991. In February 2023, Crank's exam findings were all within normal limits and the provider wrote that Crank was "more content" and "optimistic." Tr. 993.

Also in January 2023, Crank saw her doctor for a follow-up visit and reported "worsening fibromyalgia with generalized body aches." Tr. 919. On exam, Crank had multiple tender points in her upper back and between her shoulder blades. Tr. 923. She had "3/5" strength in her arms and "4/5" strength in her legs. Tr. 923. The doctor prescribed cyclobenzaprine and physical therapy. Tr. 919.

Crank started physical therapy that month for core and extremity strengthening. Tr. 1108. She reported limitations in daily activities and exhibited a decreased knowledge of a home exercise program, precautions,

pain, range of motion, strength, and "transfers." Tr. 1108. By late February, Crank's strength and flexibility had improved. Tr. 1139. Crank rated her back pain "7/10," her hand pain "6/10," and her general body pain a "5/10." Tr. 1139.

At an endocrinology appointment in February 2023, Crank reported numbness, arthralgias, and myalgias, but denied muscle weakness. Tr. 1078. On exam, she had normal neurological findings and normal extremities. Tr. 1078–79.

In March 2023, Crank had a psychological-medication-management appointment. Tr. 1144. She reported that she was to undergo mitral valve replacement surgery. Tr. 1144. Crank said that taking care of her activities of daily living was "very physically draining." Tr. 1145. On exam, she was well-groomed with average demeanor and eye contact. Tr. 1145. Crank exhibited normal speech and thought process, logical associations, and no abnormal or psychotic thoughts. Tr. 1145–47. She had an anxious mood. Tr. 1147.

A week later, Crank had mitral valve replacement surgery. Tr. 1274. In April, she started a cardiac rehabilitation program. Tr. 1716.

In June 2023, Crank denied experiencing any chest pain or shortness of breath. Tr. 1637. In July, cardiac testing showed normal left ventricle functioning. Tr. 2279.

At an August 2023 psychological-medication-management appointment, Crank said that she didn't feel that the Zoloft had made a difference. Tr. 2430. She had more energy since her heart surgery. Tr. 2430. On exam, Crank had

6

a normal appearance and average eye contact. Tr. 2430. She had normal speech, behavior, thought content and process, perception, cognition, memory, insight, and judgment. Tr. 2431–32. Crank had an anxious mood and a full affect. Tr. 2432.

In September 2023, Crank saw her doctor complaining of lower back and hip pain. Tr. 2771. Crank had unremarkable pulmonary, chest, neurological, and musculoskeletal findings except for hip and lower-back tenderness. Tr. 2772. X-rays showed mild degenerative changes in Crank's lower lumbar and lower thoracic spine and moderate facet arthrosis predominately at the lower lumbar levels. Tr. 2831. The doctor advised Crank to exercise daily. Tr. 2770, 2773.

At a November 2023 cardiology follow-up appointment, Crank "ha[d] not been describing shortness of breath or chest discomfort with activities of daily living." Tr. 2377. Crank said that her overall functional capacity was limited due to lower back and hip pain, for which she was to begin physical therapy that day. Tr. 2377. She was compliant with instructions to use her CPAP machine for sleep apnea. Tr. 2378. Examination showed normal cardiovascular rate and rhythm, normal heart sounds, and normal pulmonary effort and sounds. Tr. 2380. Crank had normal musculoskeletal range of motion, no muscle tenderness or edema, and normal reflexes. Tr. 2380.

At her physical therapy appointment, Crank reported worsening hip and lumbar spine pain. Tr. 2411. She said that her pain was aggravated by

general activity, bending, lifting, and twisting. Tr. 2411. On exam, Crank had an abnormal gait and posture and 50 percent reduced range of motion in her lumbar spine. Tr. 2411. She had intact sensation and decreased muscle strength, rated four-out-of-five, in her hips and knees. Tr. 2411–12. Crank was enrolled in an aquatic physical therapy program. Tr. 2412.

At a psychological-medication-management appointment that month, Crank said that she was stressed because her sister had moved in with her. Tr. 2438. Crank felt like she was overmedicated because she experienced nothing other than frustration. Tr. 2438. She reported that she struggled with anxiety and had panic attacks a few times a week. Tr. 2439. Sometimes she could avoid a panic attack by calming herself and performing deep breathing. Tr. 2439. On exam, Crank's mood and affect were anxious and other findings were normal or intact, other than an obese appearance. Tr. 2439–41. The provider adjusted Crank's medication. Tr. 2441. At a follow-up in late November, Crank reported that the medication adjustment had not made a difference. Tr. 2447. She reported struggling with motivation and "issues doing hygiene," and she said that she felt tired and numb. Tr. 2447. Crank enjoyed being around her family and would be cooking for Thanksgiving. Tr. 2447. Her mood and affect were depressed and she had auditory and visual hallucinations. Tr. 2449. Crank's remaining exam findings were normal or intact, other than an obese appearance. Tr. 2448.

In December 2023, Crank followed up with her doctor and said that she had worsening intermittent lower back and left hip pain. Tr. 4122. She was doing physical therapy but it wasn't helping. Tr. 4122. On exam, Crank had tenderness and normal range of motion. Tr. 4124. The doctor referred Crank to pain management. Tr. 4124.

In January 2024, Crank followed up with her doctor and reported pain in multiple joints, specifically in her hands. Tr. 4106. Crank rated her hand pain a seven-out-of-ten and said that she couldn't bend her fingers while washing dishes. Tr. 4106. On exam, Crank had general musculoskeletal tenderness, normal range of motion, and mild osteoarthritis changes and mild tenderness in her hands. Tr. 4107; *see* Tr. 2830. In February, Crank had a positive antinuclear antibody test and her doctor referred her to rheumatology. Tr. 4097.

The same month, Crank had a psychiatric-medication-management visit and reported that she tolerated a recent medication change well. Tr. 2841. She felt less numb, which "is a good thing" but it was also "overwhelming." Tr. 2841. Crank explained that she felt irritable and had intrusive thoughts. Tr. 2844. Crank's exam findings were normal or intact, other than an obese appearance and an anxious mood and affect. Tr. 2842–44. The provider adjusted Crank's medication. Tr. 2844. In February, Crank said that her mood had improved. Tr. 2850. She still had "some anxiety" but was "doing a better job of calming herself." Tr. 2850. She reported "a lot of pain" and occasional

9

panic attacks when she was around people. Tr. 2850. Crank's exam findings were intact or normal, other than an obese appearance. Tr. 2851–52.

Also in February, x-rays of Crank's hips showed mild degenerative changes with mild joint space narrowing. Tr. 3819. In June, Crank underwent a lumbar spine CT, which showed mild multilevel degenerative disc disease and facet arthropathy. Tr. 3607.

In July 2024, Crank had a psychiatric-medication-management appointment. Tr. 2868. She was experiencing a fibromyalgia flair and had pain "everywhere." Tr. 2868. Her depression was worse and she had racing thoughts and some suicidal thoughts. Tr. 2866. On exam, Crank had average eye contact and normal speech, behavior, thought process, perception, orientation, insight, and judgment. Tr. 2469–71. She had suicidal ideation with no intent or plan, a forgetful memory, and a depressed mood and affect. Tr. 2870. Crank's attention and concentration were intact. Tr. 2870. The provider increased one of Crank's medications, and the next month Crank reported that the medication adjustment improved her mood changes, suicidal thoughts, energy level, and anxiety. Tr. 2877.

At a September 2024 medication-management appointment, Crank said that her depression and mood swings "continue[d] to improve." Tr. 2886. Her anxiety was "overall … better," and, although she reported having a financial-stress-induced panic attack the day before the appointment, she said that she took her medication, which helped. Tr. 2886. Crank said that she continued to

struggle with pain. Tr. 2886. Her exam findings were normal or intact. Tr. 2887–88.

In October 2024, Crank said that, aside from a recent financial stressor, "things are going okay overall." Tr. 2895. She reported that the increase in one of her medications helped but she worried that she was "starting to feel slightly numb so [she] want[ed] to keep an eye on that." Tr. 2895. Crank denied sustained depression and panic attacks. Tr. 2895. Her exam findings were normal or intact. Tr. 2896–98.

In January 2025, Crank reported that she felt more anxious and depressed for the "past several weeks." Tr. 2904. She denied sustained depression and panic attacks. Tr. 2904. On exam, Crank had an obese appearance, average eye contact, and normal speech. Tr. 2905. Her behavior was cooperative and her thoughts were logical. Tr. 2905. Crank's thought content and perception were normal. Tr. 2905–06. Crank had intact orientation, attention, and concentration, and a normal memory. Tr. 2906. Her mood and affect were depressed. Tr. 2906. She had good insight and judgment. Tr. 2906. The provider adjusted Crank's medication. Tr. 2907.

In February 2025, Crank reported feeling better. Tr. 2013. Her mind was not racing or focusing on bad things. Tr. 2913. She was sleeping too much, but she hadn't been wearing her CPAP machine because of recent dental work. Tr. 2913. Crank said that she spoke to her pulmonologist about starting a medication to help with her daytime sleepiness—Crank had been on this

11

medication before and it worked "really well." Tr. 2913. Crank's exam findings were normal or intact. Tr. 2914–15.

That month, Crank saw her doctor for a follow-up. Tr. 3997. Crank reported worsening fibromyalgia and chronic, intermittent lower back pain, rated "5/10." Tr. 3997. She asked to change her pain management clinic. Tr. 3997. On exam, Crank had lumbar tenderness and normal range of motion. Tr. 3998. The doctor referred Crank to pain management and recommended that she lose weight, exercise daily, apply a compress and over-the-counter pain cream, and stop smoking. Tr. 3999.

In March 2025, Crank said that she had been feeling overwhelmed because "her kids have all had several doctor app[ointments] in the past 2 weeks." Tr. 2922. Other than an obese appearance, Crank's exam findings were normal or intact. Tr. 2923–24. At a pain management visit, Crank described sharp, stabbing pains in her hips with standing, walking, bending, twisting, and changing positions. Tr. 2961. She reported some discomfort in her lower back when changing positions. Tr. 2961. On exam, Crank had full strength in her lower extremities and tenderness in her lumbar spine. Tr. 2965. The provider referred her to physical therapy, suggested future sacroiliac joint injections, and started Crank on Lyrica. Tr. 2965–66.

In April 2025, Crank had a psychological-medication-management visit. Tr. 931. She reported feeling down. Tr. 2931. She had difficulty completing household tasks due to back pain and had to take breaks. Tr. 2931. She said

12

that she had joined the YMCA and that swimming and using the hot tub helped her back pain. Tr. 2931. On exam, Crank had normal speech, behavior, thought process, thought content, perception, and memory. Tr. 2932–33. Her attention and concentration were intact and her insight and judgement were good. Tr. 2933. Crank had a euthymic mood.[3] Tr. 2393. The provider continued her medications. Tr. 2934.

In May 2025, Crank visited the anticoagulation clinic and was doing well on the anticoagulation drug Warfarin. Tr. 3047. She was about to begin physical therapy. Tr. 3047.

*Function report*

In a January 2023 Function Report, Crank reported caring for her 13-year-old daughter, preparing meals, taking medication, and handling personal care without the need for reminders. Tr. 450–51. Crank said that she could drive a car, shop in stores, leave home daily, and handle her own finances. Tr. 452. She could go out alone and spent time with others in person or by telephone. Tr. 453.

*State agency opinions*[4]

In March 2023, Ellen Rozenfeld, Psy.D., reviewed Crank's record and found that she had no limitations in her ability to understand, remember, or

---

[3] A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary, at 647 (33rd ed. 2020).

[4] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the

13

apply information, and moderate limitations in her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. Tr. 145. As for Crank's residual functional capacity (RFC),[5] Dr. Rozenfeld found that Crank could perform simple, repetitive tasks in a setting that wasn't fast-paced or required high-production quotas. Tr. 149. "Variable paced tasks with end of day production quotas would be acceptable." Tr. 149. Crank could interact with others on a brief, superficial basis in a setting that involved minimal public contact. Tr. 149. And she could adapt to a routine, predictable setting in which changes would be introduced slowly and explained in advance. Tr. 150.

In July 2023, Kari Kennedy, Psy.D., reviewed Crank's record and agreed with Dr. Rozenfeld's findings. Tr. 156, 161.

In March 2023, Lynn B. Green, M.D., reviewed Crank's record and found that Crank could perform light work—stand, walk, and sit for about six hours a day and lift and carry 20 pounds occasionally and 10 pounds frequently. Tr.

---

claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]     A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

147. She could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl, and could never climb ladders, ropes or scaffolds. Tr. 147. Crank should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to extreme heat. Tr. 148.

In July 2023, Charles Gruenweld, M.D., reviewed Crank's record and opined that Crank could perform sedentary work—stand and walk for two hours, sit for six hours, and lift and carry 10 pounds occasionally and less than 10 pounds frequently. Tr. 158. Dr. Gruenweld adopted Dr. Green's remaining limitations, but assessed further environmental limitations in finding that Crank must avoid concentration exposure to vibrations and hazards. Tr. 159.

*Hearing testimony*

Crank, who was represented by counsel, testified at the administrative hearings. The ALJ summarized Crank's testimony at these hearings as follows:

> At the hearing, she testified that she continues to drive but not for long periods and must stop and be out of her car for a while. She testified that she has not worked since 2010. She further testified that she spends most of her day at medical appointments and sometimes preparing dinner. The claimant reported that her primary problems are with her back and hips, resulting in standing for only 20 minutes before needing to rest. She testified that she must get up from sitting after about 20 to 30 minutes to walk around. She noted significant exhaustion, even with activities such as taking a shower, and that she does not do much cleaning due to pain. Finally, the claimant indicated that she does leave the house 3-4 times per month, usually for groceries, but does experience anxiety with larger crowds. She reported that her overall physical and mental health condition renders her unable to perform full-time

15

work. (Hearing testimony, Exs. B3E, B16E).

The claimant alleged limiting effects due to symptoms of her physical and mental impairments. She testified to the following at the past two hearings unless otherwise specified. She has cardiac difficulty, undergoing a surgical procedure on her heart in March 2023. She has had shortness of breath and fatigue both before and after the surgery, but this has improved somewhat since the surgery. She has some fluid accumulation in her lungs as well, which causes pain and shortness of breath. She has sleep apnea and uses a CPAP nightly. Her diabetes is under control with medication management. She has some neuropathy symptoms in her feet, with a "pins and needles" sensation and numbness. She has bilateral carpal tunnel syndrome with a history of release on the left in October 2022. She has some ongoing numbness in both hands and her hands tend to cramp up. She estimates she can stand for about 10 minutes at a time and can walk less than that period. She can sit for about 20 minutes at a time. She has some swelling in her legs and needs to lay down, elevating her legs on a pillow above her heart every couple of days. She has a cane that she uses almost "all the time" for standing and walking. She says that cane was prescribed by a doctor. She has pain in her back and her hips and starts at a pain clinic next week. She reported she was 5'4" tall and weighed 257 pounds at the time of the hearing. Psychologically, she has episodes of panic and anxiety about 3-4 times per week but can interact with other people fairly well and is able to focus throughout a 60-minute television program.

Regarding activities of daily living, she currently lives in a townhome with her husband and two children, ages 14 and 21. She has trouble going up and down stairs without shortness of breath and pain in her knees. She has a driver's license and can drive except at night. She spends most of her time going to doctors' appointments, usually 4 or 5 appointments per week. She can bathe herself, shower, and get dressed, though this will make her

fatigued. She does not do much cleaning around the house because of her pain. She can get out to shop or go out to eat about 3-4 times a month. She uses an electric cart when shopping. She has difficulty using buttons and picking up coins, but she can use a smartphone. She can go to some of her daughter's volleyball games, though she feels pain after doing so.

Tr. 24–25.

At the second hearing in July 2025, the ALJ found that Crank had no past relevant work. Tr. 50. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Crank could perform any work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 63–64. The vocational expert answered that such an individual could perform the following jobs—address clerk, table worker, and hand bander. Tr. 64–65.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since November 21, 2022, the application date (20 CFR 416.971 *et seq*.).
>
> 2. The claimant has the following severe impairments: diabetes mellitus II with neuropathy; cirrhosis due to fatty liver disease; obesity; mitral valve regurgitation status post mitral valve replacement; obstructive sleep apnea; chronic obstructive pulmonary disease (COPD); bilateral carpel tunnel syndrome, status post left-sided release; hand osteoarthritis; fibromyalgia; vertigo; depressive disorder; anxiety disorder; personality disorder (20 CFR 416.920(c)).

17

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant can occasionally push and/or pull with the right lower extremity. She can occasionally climb ramps or stairs; occasionally stoop, kneel, and crouch, but never climb ladders, ropes, or scaffolds, or crawl. The claimant can perform frequent handling and fingering; and feel with the bilateral upper extremity. She cannot have exposure to extreme cold, extreme heat, vibration; The claimant cannot tolerate excessive exposure to atmospheric conditions. She cannot work in high, exposed places or in proximity to moving mechanical parts. She cannot drive or operate machines/equipment. The claimant can understand, remember, and carryout simple instructions. Additionally, she can perform work without a specific production pace, such as an assembly line or hourly production quotas. She can have occasional interaction with coworkers and supervisors, but no interaction with the general public. She can also make simple work-related decisions. Moreover, the claimant can deal with occasional changes in a routine work setting explained in advance.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was … 39 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 21, 2022, the date the application was filed (20 CFR 416.920(g)).

Tr. 20–31.

### Legal Standard

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

19

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

20

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

21

**Discussion**

Crank argues that the ALJ's RFC assessment is unsupported by substantial evidence for numerous reasons, discussed below. Doc. 8, at 14, 17.

1.  *The ALJ did not err on the issue of absenteeism*

Crank argues that the ALJ "failed to consider the impact the frequency of [Crank's] treatment would have on her ability to work." Doc. 8, at 14. She submits that "[t]he record unambiguously supports the need for treatment more than two days per month"; the vocational expert at the second administrative hearing testified that an employer would not tolerate one or more days of work missed a month; and the vocational expert at the first administrative hearing said that arriving at work more than an hour late or leaving work more than an hour early would constitute a full missed day of work. *Id.*; *see* Tr. 66, 104 (vocational expert testimony). Crank therefore argues that she "would not be able to sustain employment due to her need to treat her severe impairments," and the ALJ erred when he failed to account for or discuss Crank's would-be work absences. *Id.* at 14–15. Crank provides a list of all of the medical appointments she had each year from 2022 to 2025. *Id.* at 15–16.

The Commissioner doesn't dispute the number of medical appointments that Crank had. But the Commissioner asserts that no medical opinion in the

22

record indicated that Crank would be absent from work.[6] Doc. 9, at 6. And the Commissioner relies on a case in the Northern District of Ohio that rejected the argument that Crank makes here and urges this Court to do the same. *Id.*, at 5–6 (citing *Chaney v. Comm'r of Soc. Sec.*, No. 5:18-cv-2769, 2020 WL 789189 (N.D. Ohio Feb. 18, 2020)). In *Chaney*, the court explained:

> there is no[] evidence that these [medical] appointments could not be scheduled around work hours…. As the Tenth Circuit has explained: "[P]laintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty ... in that it assumes she was required to miss entire days of work for each appointment." *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000); *see also Pryor v. Comm'r of Soc. Sec.*, 2015 WL 12683977, at \*7 (E.D. Mich.) ("Pryor has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule."), *report and recommendation adopted*, 2015 WL 6735336; *Leaverton v. Colvin*, 2013 WL 1316901, at \*3 (N.D. Okla.) ("Plaintiff added up the number of doctor visits and phone calls to his doctor he made over the pendency of this case

---

[6]     In her reply brief, Crank contends that "[t]he check-box forms completed by the State agency reviewing physicians do not contain an option to address nonexertional limitations, such as absenteeism or time off task." Doc. 10, at 4 (citing Program Operations Manual System (POMS) DI 24510.050 *Completion of the Physical RFC Assessment Form* (available at https://secure.ssa.gov/poms.nsf/lnx/0424510050)). Crank doesn't cite the POMS Mental RFC Assessment Form. It appears that a state agency reviewer may indeed assess absenteeism limitations. *See, e.g., Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 753 (N.D. Ohio 2020) (evaluating the ALJ's assessment of the state agency reviewer's opinion that the claimant would be absent from work due to symptom severity). In any event, whether the form contains an option to discuss absenteeism, the fact remains that no medical opinion in the record indicated that Crank would be absent from work. And Crank could have, but did not, submit medical opinion evidence from one of her providers.

23

> and argues that number of absences would preclude employment. Nothing in the record suggests an entire day off is necessary for each appointment or that appointments could not be scheduled around hours of employment."); *Brock v. Astrue*, 2008 WL 4104551, at \*16 (W.D. Mo.) ("Further, the fact that a claimant must attend regular healthcare appointments does not necessarily indicate that she cannot work; there is nothing in the record to indicate that Brock could not schedule her appointments around her work schedule.").

2020 WL 789189, at \*9 (N.D. Ohio Feb. 18, 2020); *see also Erickson v. Bisignano*, No. 5:25-cv-1606, 2026 WL 1141181, at \*17 (N.D. Ohio Apr. 28, 2026) (following *Chaney*), *report and recommendation adopted*, 2026 WL 1506054 (N.D. Ohio May 29, 2026).

In support of her argument, Crank cites three cases from the Eastern District of Michigan. Doc. 8, at 16. In *Kaiser v. Commissioner of Social Security*, No. 23-10431, 2024 WL 1317769, at \*6–7 (E.D. Mich. Mar. 26, 2024), *Griffin v. Commissioner of Social Security*, No. 2:15-cv-13715, 2017 WL 991006, at \*2 (E.D. Mich. Mar. 15, 2017), and *Robinson v. Commissioner of Social Security*, No. 17-cv-12118, 2018 WL 4906612, at \*4 (E.D. Mich. July 12, 2018), *report and recommendation adopted*, No. 17-12118, 2018 WL 4328077 (E.D. Mich. Sept. 11, 2018), the courts found that the ALJ erred by not discussing absenteeism when omitting such limitations from the RFC, given the plaintiff's statement that she was bed-bound half the month and called off work a few days a week (*Kaiser*) or based on the number of medical appointments in the record (*Griffin* and *Robinson*).

24

Another case Crank cites in support, *Bell v. Commissioner of Social Security*, No. 1:22-cv-723, 2022 WL 18156676, at *12 (N.D. Ohio Nov. 29, 2022), *report and recommendation adopted*, 2023 WL 130837 (N.D. Ohio Jan. 9, 2023), Doc. 8, at 16, is not on point. In *Bell*, two doctors submitted medical opinions stating that Bell would be absent from work multiple days a month due to his gastroparesis symptoms, and one doctor expressly noted Bell's "multiple emergency room visits every month." 2022 WL 18156676, at *10. The record showed that Bell had numerous emergency room visits and hospitalizations for "vomiting, dehydration, vomiting-induced anemia, and other abnormal laboratory findings." *Id.* at *11. The ALJ failed to adequately address the medical opinions on absenteeism, which the court found was error because "Bell actually missed at least 2 days of work per month due to his emergency room visits for his gastroparesis symptoms." *Id.* at *11–12. Here, no provider opined that Crank would miss work, and the record doesn't show a commensurate history of emergency room visits in which Crank actually missed work.

That leaves the Michigan cases, *Kaiser*, *Griffin* and *Robinson*, and the cases in this district, *Chaney* and *Erickson*. Because the cases in this district are more persuasive, I recommend that the Court follow the rationale in *Chaney* and *Erickson*.[7] *See also Malak v. Comm'r of Soc. Sec.*, 131 F.4th 1280,

---

[7]     In her reply brief, Crank argues that *Chaney* is distinguishable because the ALJ in *Chaney* discussed the frequency of the claimant's appointments, whereas in Crank's case the ALJ did not. Doc. 10, at 1–2. But in *Chaney*, a

1286–87 (11th Cir. 2025) ("We hold that a claimant's medical appointments and whether those appointments affect the claimant's ability to work are not appropriate factors for the ALJ to consider when addressing the claimant's RFC. With that, Malak cannot use her previous medical appointments to argue that her RFC would have been different had those appointments been considered."); *Combs v. Kijakazi*, 69 F.4th 428, 436 (7th Cir. 2023) (rejecting the plaintiff's argument that the ALJ "should have considered the amount of time that she would have missed work…. due to her multiple procedures and appointments" when the record showed that some appointments "lasted only ten minutes" and "it [was] difficult to see how [her appointments] would have necessitated a full day off work.").

Moreover, Crank bears the burden of showing that the ALJ's RFC is unsupported by substantial evidence, *see Jordan*, 548 F.3d at 423, and she has not shown that she would miss work every time she had a medical appointment. *See, e.g., Pryor*, 2015 WL 12683977, at *7 ("Pryor has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule."); *Hodson v. Comm'r of Soc. Sec.*, No. 317-cv-96, 2018 WL 3326842, at *4–6 (W.D. Ky. Mar. 1, 2018) (discussing cases and finding that the claimant

---

doctor opined that the claimant would miss more than four days of work a month due to symptoms or treatment, a finding that the ALJ rejected. *Chaney*, 2020 WL 789189, at *9, Here, no medical provider opined that Crank would be absent from work, so there was no medical opinion on absenteeism for the ALJ to discuss.

failed to meet her burden to show that the ALJ's RFC was unsupported or that the ALJ erred by not discussing absenteeism because no provider offered an opinion about the number of medical appointments she would need and the claimant had no proof that the appointments would conflict with a work schedule), *report and recommendation adopted*, 2018 WL 1558106 (W.D. Ky. Mar. 30, 2018).

I recommend that the Court find that Crank has not shown that the omission in the ALJ's decision of an absenteeism limitation or explanation for why such a limitation was omitted renders the ALJ's decision unsupported by substantial evidence.

> 2. *The ALJ did not err when evaluating the medical opinions*

> a. *mental limitations*

Crank challenges a portion of the ALJ's evaluation of the mental limitations proffered by the state agency reviewers, Doc. 8, at 17–18, which in relevant part is as follows:

> the bulk of the objective medical evidence in the record, which shows some mental symptoms upon examination, along with a history of complaints of depression and anxiety with panic episode and difficulty managing her mood, but generally benign findings on examinations through much of the period at issue (see, e.g., Exs. 6F, 10F, 17F, 31F), including recent examination that noted average eye contact and intelligence; normal speech, thought process, thought content, and memory (Ex. 39F/1-4).

Tr. 30.

Crank argues that the ALJ mischaracterized the evidence when he

27

described "the bulk of the objective medical evidence" as containing "generally benign findings." Doc 8, at 18. She submits that the record contains "generally abnormal findings," including "the one 'recent treatment' note cited by the ALJ," which, Crank argues, shows that Crank had auditory and visual hallucinations and a depressed mood. *Id.* at 19. (citing Tr. 2834).

It is true that the November 2023 treatment note that the ALJ cited indicated that Crank had auditory and visual hallucinations and a depressed mood. Tr. 2834. But it is also true that the treatment note showed that Crank had average eye contact and fund of knowledge and was within normal limits in the following areas: speech and language; behavior and activity; thought process and associations; thought content; cognition and orientation; memory; and insight and judgment. Tr. 2833–35. She also had intact attention and concentration. Tr. 2834. So the ALJ's reference to "generally benign findings on examinations through much of the period at issue," Tr. 30, including at the late November 2023 visit, was accurate.

Elsewhere in the decision, the ALJ acknowledged that "the record shows" that Crank had "some difficulty managing her mood," including that she was "noted to be anxious and overwhelmed during some office visits and she reported some panic episodes as well." Tr. 28. The ALJ summarized some of the findings of record, including abnormal findings such as a preoccupied demeanor, avoidant eye contact, agitation, racing and rapid speech, and an anxious mood. Tr. 28. The ALJ specifically noted Crank's reports of "ongoing

hallucinations" at the November 2023 appointment, but also observed that despite this, Crank had "average eye contact and intelligence; normal speech, thought processes, thought content, and memory." Tr. 28. In other words, the ALJ acknowledged Crank's abnormal exam findings, but pointed to the fact that Crank retained certain normal baseline exam findings, which is not inaccurate, and reported that her counseling and prescribed medication were helpful. Tr. 28. The ALJ was not required to recite these facts again when discussing the opinion evidence. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (the ALJ is not required to repeat factual findings made elsewhere in the decision).

Crank complains that the November 2023 note was "not recent" and says that she "continued to treat" through 2025. Doc. 8, at 19. She argues that "the notes show[] abnormal findings," but she cites records from 2022, which are not more recent than the November 2023 records. *Id.* She string-cites instances of abnormal exam findings without dating these records, and she cites at least one of the same records twice.[8] In any event, Crank hasn't shown that the ALJ's reference to the November 2023 visit as "recent" was error; the ALJ recognized that Crank received treatment in 2024 and he cited treatment notes from psychological-medication-management visits from April 2025. Tr.

---

[8]     For example, the November 21, 2023 treatment record is in the transcript twice—at Tr. 2447–49 and Tr. 2832–34. Crank's presentation suggests these are different occurrences, Doc. 8, at 19, but the records are from the same visit.

28, 30 (citing B39F/100, Tr. 2931). Crank cites about three-years-worth of counseling records indicating abnormal mental status exam findings. Doc. 9, at 20. But the ALJ was not required to discuss every treatment note in the record. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for [her] decision to stand."). Crank has not shown that the ALJ misconstrued the evidence when he found that the state agency reviewers' opinions were consistent with the overall record, which he found showed "generally benign [exam] findings" despite "some mental symptoms upon exam." Tr. 30.

Crank also argues that the ALJ's purported mischaracterization of the evidence means that the ALJ "failed to evaluate [Crank's] symptoms pursuant to SSR 16-3p and 20 C.F.R. § 416.929." Doc. 8, at 17, 21. For the same reasons explained above, the ALJ's characterization of the evidence was not faulty, so Crank hasn't shown that the ALJ's evaluation of Crank's allegation of mental symptoms was erroneous. Moreover, the ALJ also relied on Crank's daily activities and response to medication when evaluating her allegations of symptoms, Tr. 28, 30, which was proper, *see* 20 C.F.R. § 416.929(c)(3)(i),(iv),(v), and which Crank hasn't challenged.[9]

---

[9] In her reply brief, Crank asserts that the ALJ was "required to consider 'the frequency or extent of the treatment sought by an individual." Doc. 10, at 4 (citing Soc. Sec. Ruling 16-3p, 2017 WL 5180304) (Oct. 25, 2017)). But a duty to "consider" the evidence is different than a duty to "discuss" the evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense*

### b. physical limitations

Next, Crank challenges the ALJ's evaluation of the state agency reviewers' opinions regarding Crank's physical limitations. Doc. 8, at 21. The ALJ found these opinions to be "persuasive overall"; stated that the reconsideration opinion assessing "more significant sedentary exertional limitations" was "the more persuasive of the two [opinions];" and "added more significant limitations to environmental exposure to account fully for the claimant's cardiac and breathing difficulties." Tr. 29.

As the Commissioner asserts, Doc. 9, at 7–8, any purported error benefitted Crank and would be harmless, at best. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions" in the RFC than were suggested in the state agency reviewers' opinions) (citations omitted); *see Taffi v. Comm'r of Soc. Sec.*, No. 5:25-cv-40, 2025 WL 3687276, at *12 (N.D. Ohio Dec. 19, 2025) ("Like other courts, the undersigned 'will not fault the ALJ for finding more restrictions than the state agency reviewers opined.'"), *report and recommendation adopted*, 2026 WL 702994 (N.D. Ohio Mar. 12, 2026); *Ferris v. Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

In response, Crank argues that the ALJ's additional restrictions were

---

*Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)). Crank has not shown that the ALJ failed to consider her treatment.

31

"slight[]." Doc. 10, at 5. Even so, she doesn't explain why the result should be different.

In any event, the ALJ did not err, as Crank alleges. Crank complains that the ALJ references her "cardiac/pulmonary impairments," but that "the ALJ failed to explain how … treatment notes relating to Crank's [fibromyalgia], neuropathy, and multiple arthritic conditions are consistent with" the state agency reviewers. Doc. 8, at 22. But the ALJ referenced Crank's "ongoing fatigue …, pain, and neuropathy" when discussing how the state agency opinions were consistent with the "bulk of the objective medical evidence." Tr. 29. The ALJ also wrote that "records have consistently noted non-debilitating symptoms … with no significant abnormality on examination." Tr. 29 (citing, "e.g., Ex … 36F/13–14," Tr. 2768–69). Crank asserts that the treatment record the ALJ cited shows that she had "lumbosacral tenderness and mild left hip tenderness." Doc. 8, at 22; Tr. 2768. But she hasn't shown that this is a "debilitating symptom" or a "significant abnormality," especially when on exam she was in no distress and had normal range of motion and no focal deficits. Tr. 2768.

Moreover, elsewhere in the decision the ALJ discussed Crank's non-cardiac and non-pulmonary physical impairments. *See* Tr. 26–28 (the ALJ detailing records regarding Crank's neuropathy symptoms from osteoarthritis, fibromyalgia, carpal tunnel syndrome, diabetes, and reports of lower back and hip pain, including: "several normal exams with respect to strength, gait, and

32

range of motion"; "imaging showed only mild osteoarthritis"; medication-controlled diabetes; no need for a cane; reduced extremity strength in early 2023 for which she received physical therapy; reports of arm and hand pain and hand and feet tingling and numbness; normal reflexes; and obesity). Indeed, the ALJ "considered [Crank's] pain and neuropathy" and all of her impairments when he limited Crank to sedentary exertional-level work with additional restrictions. Tr. 27, 28. The ALJ wasn't required to recite all of this evidence again when evaluating the state agency reviewers' opinions. *See Forrest*, 591 F. App'x at 366.

Finally, Crank argues that the ALJ "failed to explain how this evidence is inconsistent with [Crank's] allegations." Doc. 8, at 25. But she doesn't identify what specific "evidence" she is referring to. Her argument appears to be a challenge to the ALJ's evaluation of Crank's allegations of symptoms. *Id.* (citing "SSR 16-3p and 20 C.F.R. § 404.1529."). To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and

33

"[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

Crank conflates the requirement that the ALJ discuss the *consistency* of the evidence when evaluating a medical opinion, *see* 20 C.F.R. § 404.1520c(b)(2), with what the ALJ is required to consider when evaluating a claimant's reports of symptoms, 20 C.F.R. § 404.1529. Here, the ALJ discussed Crank's treatment (physical therapy, medication, surgery), objective exams (at times unremarkable and showing intact strength, gait, and range of motion), and "generally mild diagnostic imaging." Tr. 25–27. These were appropriate items to consider, *see* 20 C.F.R. § 404.1529(c)(2)&(3) (the ALJ considers objective evidence and treatment), and the ALJ wasn't required to discuss all of the factors, *Cross*, 373 F. Supp. 2d at 733. Crank hasn't shown that the ALJ erred when evaluating her reports of symptoms.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: July 13, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais,* 928 F.3d 520, 530–31 (6th Cir. 2019).